**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| SHEILA GRADY, Parental Guardian for Robert L. Darby, III,<br><br>Plaintiff,<br><br>vs.<br><br>MICHAEL J. ASTRUE, Commissioner of Social Security,<br><br>Defendant. | )<br>)<br>)<br>)<br>) CIVIL CASE NO. 07-421-PMF<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**MEMORANDUM AND ORDER**

**FRAZIER, Magistrate Judge:**

Plaintiff, Sheila Grady, seeks judicial review of a final decision of the Commissioner of Social Security denying her March, 2004, application for supplemental security income on behalf of her son, Robert Lee Darby, III. An Administrative Law Judge (ALJ) denied the application after finding that Robert was not disabled. That decision became final when the Appeals Council declined to review the ALJ's decision. Judicial review of the Commissioner's final decision is authorized by 42 U.S.C. § 405(g) and 42 U.S.C. §1383(c)(3).

To receive supplemental security income, a child must be "disabled." A disabled child is a person under the age of 18 who has physical or mental impairments resulting from anatomical, physiological, or psychological abnormalities which can be demonstrated by medically acceptable clinical and laboratory diagnostic techniques. The impairments must have resulted in marked or severe functional limitations which have lasted or are expected to last not less than 12 continuous months. 42 U.S.C. § 1382c(a)(3)(C)(i).

The Social Security regulations provide for a three step sequential inquiry that must be

followed in determining whether a child is disabled. 20 C.F.R. § 416.924(a). The Commissioner must determine in sequence: (1) whether the claimant is engaged in substantial gainful activity, (2) whether the claimant has a medically severe impairment or combination of impairments, and (3) whether the impairment or combination of impairments meet or equal the criteria of a listing or the functional equivalent of a listing. *Id*.

Plaintiff does not argue that Robert's impairments met the criteria for a listed impairment. Hence, the Court will focus on the finding that Robert's impairments were not functionally equivalent to the listings for diabetes and/or attention deficit hyperactivity disorder (ADHD). To determine whether impairments are functionally equivalent to a listed impairment, ALJs evaluate six categories or "domains" of functioning. Robert was disabled if he had "marked" limitations in two domains or an "extreme" limitation in one domain. 20 C.F.R. § 416.926a(d). A marked limitation is one which seriously interferes with the child's ability to independently initiate, sustain, or complete activities. 20 C.F.R. § 416.926a(e)(2)(I).

### I.  Background

Robert was born on December 31, 1991. His mother reported that he was very argumentative and aggressive and easily grew angry and upset and lost control over his temper. He did not listen to or show respect for others, did not respect or follow rules, and felt that others were "out to get" him. He could not keep still and talked a great deal, often interrupting others. He became angry and screamed in an effort to persuade others to listen to him. He believed his way was always "right" and any other way was always "wrong." When he received reminders and explicit instruction, he could care for his own personal hygiene. He was able to study and finish homework

but required extra time to complete his lessons. He was able to take medication when it was measured for him and offered at the appropriate time. He could not wash clothing and put it away, cook a meal, use public transportation by himself, accept criticism, avoid trouble, obey rules, avoid accidents, or ask for help when needed. He resisted assigned household chores. He did not keep busy on his own, grew impatient, and failed to finish what he started. He became bored or angry and ruined projects when the work did not suit him. He could write but grew angry when he made an error. He could not explain simple or complex ideas or understand or explain his own behavior. He could not prepare written forms, answer a telephone, or take and deliver written messages. He had a limited ability to count money but could not shop independently. He could read and tell stories but had a limited ability to report what he had read. He could express his own ideas and opinions and speak in a manner that was easily understood. Robert had friends in his own age group but did not make friends easily. He started fights, failed to see any point of view other than his own, and blamed his friends when things did not go his way.

Robert attended school when he was quite young, but he could not focus on his work and became aggressive with himself and others. Because of his behavior problems, Robert has been home-schooled since the third grade.

In December, 1998, Robert was diagnosed with ADHD. The doctors who prepared the intake form wrote that Robert had difficulty in school and with peer relations. He was treated with medication, with good results, and was also referred for therapy. The doctors assessed a GAF score

of 65 (R. 147-149).[1] Robert and his mother participated in behavior therapy in 1998 and 1999. Robert's ADHD was also treated with a variety of medications.

In February, 2004, Robert was hospitalized for four days at St. Louis Children's Hospital. He was diagnosed with type I diabetes with ketoacidosis and placed on a treatment plan including a diabetic diet with carbohydrate counting, regular monitoring of blood glucose levels, and four daily insulin injections.

On April 14, 2004, Dr. Hollander wrote that Robert had been well with no sick days. She formed the opinion that laboratory reports showed that Robert had fair control of his diabetes. The family was commended for doing a good job with Robert's care and received a brochure about summer camp. Robert was encouraged to find a form of regular physical exercise (R. 150-151).

Robert's diabetes care was followed by Mr. Curtis Morris, a physician's assistant. On April 15, 2004, he noted that Robert's diary showed blood glucose levels that were in good to excellent control and noted that he had no episodes of extreme hypoglycemia. Mr. Morris formed the impression that Robert's diabetes was in fair to good control. He observed that Robert was very talkative but not as disruptive (R. 233).

On May 5, 2004, Mr. Morris prepared a diabetic report. He wrote that Robert's compliance with diabetic therapy was good, with no acidosis or obvious complications. He described Robert's appearance as "very healthy" (R. 166-167). Mr. Morris also prepared a hyperactivity disorder report. He wrote that Robert interrupted conversation frequently and fidgeted. He seemed very

---

[1] The Global Assessment of Functioning Scale describes psychological, social, and occupational functioning on a hypothetical scale. A score of 65 reflects some mild symptoms or some difficulty in social, occupational, or school functioning. American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 34(rev. 4th ed. 2000)

intelligent and was able to focus on tasks. Mr. Morris reported six symptoms and assessed fidgeting as being moderately severe. Blurting out answers to questions and excessive talking were described as severe. Mr. Morris concluded that Robert was home-schooled due to his hyperactivity, which was deemed moderate (R. 168-70).

On May 27, 2004, Dr. Coe performed a consultative examination. Dr. Coe formed the impression that Robert was home-schooled because he did not get along very well in school. He further reported that Robert had some social activity but not too much. Robert was clean, cooperative, oriented, and seemed to have memory. His speech was normal, and he was able to answer questions. He was a bit rude. Dr. Coe diagnosed diabetes, a history of ADHD, and a history of behavior problems, difficulty in school, and problems getting along with other people (R. 171-172).

On June 12, 2004, Robert fell and broke a bone in his right leg. The fracture was surgically repaired, and Robert was medically restricted from strenuous activity. He was weaned from crutches and participated in physical therapy for four weeks (R. 187-198).

On June 29, 2004, Robert was evaluated for a complaint of blurred vision. An optometrist assessed Robert's visual acuity as 20/60 in the left eye and 20/20 in the right eye. No specific prescription was advised, although Robert was invited to return for a contact lens fitting in the future (R. 177-180).

On July 14, 2004, Mr. Morris performed a follow-up evaluation of Robert's diabetes, indicating that Robert had some trouble with his blood glucose levels due to his inability to exercise and that he had some very rare blood glucose levels as high as 400. He encouraged Robert's mother to continue what she was doing and formed the impression that Robert's diabetes was in fairly good control (R. 181, 233).

On August 2, 2004, Dr. Harry Deppe performed a psychological consultation. Dr. Deppe collected information regarding Robert's history and observed that Robert's speech was extremely loud at times, that he interrupted others on several occasions, and that he displayed some difficulty staying on task. He assessed Robert's ability to relate to others as fair to poor, his ability to understand and follow simple instructions as fair, his ability to maintain attention to perform simple tasks as fair to poor, and his ability to withstand the stress associated with work as fair. At Axis V, he assessed Robert's overall functioning level at 50-6 (R. 184-86).

On August 28, 2004, a consultant reviewed Robert's file and formed the opinion that he had a severe combination of impairments (ADHD and diabetes) that did not meet or functionally equal the listings. Judging Robert's restrictions in the domains of functioning, the consultant found no limitation in three areas: acquiring and using information, caring for self, and health and physical well-being. In the other three domains, Robert had limitations that were less than marked: attending and completing tasks, interacting and relating with others, and moving about and manipulating objects. (R. 121-124).

In September, 2004, Dr. Young evaluated Robert's broken leg, indicating that the fracture was well-healed and that Robert was doing well (R. 192).

On December 7, 2004, Mr. Morris expressed concerns about Robert's ability to care for himself and make proper medication adjustments without considerable supervision. He wrote that Robert was extremely immature and affected by his lack of communication with other children. At that time, Robert's hemoglobin $A_{1c}$ level had made a significant jump.[2] Mr. Morris wrote that Robert's diabetes was poorly controlled (R. 232).

---

[2] A hemoglobin $A_{1c}$ test is a standard tool for determining blood glucose control in patients with diabetes. The test reflects glucose levels over the preceding 2 to 3 months. *The Merck Manual of Diagnosis and Therapy*, Sec. 12, Ch. 158 (18th Ed. 2006).

On December 16, 2004, two health professionals reviewed Robert's file and decided that his medically determinable impairments were or had been at listing level severity but did not remain at that level of severity for 12 continuous months. They judged Robert's domain restrictions in the same manner as the consultant, with no limitations in three domains and less than marked limitations in three domains (R. 126-130).

In April, 2005, Mr. Morris reevaluated Robert's condition and assessed controlled diabetes and ADHD (R. 230-231).

In June, 2005, Mr. Morris evaluated Robert's condition and assessed controlled diabetes and ADHD. Strattera was prescribed for a period of 30 days for Robert's ADHD (R. 228-29).

Also in June, 2005, Robert's vision was tested, with amblyopia detected in his right eye (R. 236).

In October, 2005, Mr. Morris evaluated Robert's condition and assessed controlled diabetes, noting the management of the disease was surprisingly good despite discrepancies in care (R. 226-27).

In January, 2006, Mr. Morris evaluated Robert's condition and assessed controlled diabetes (R. 220-22).

In March, 2006, Mr. Morris evaluated Robert's condition and assessed controlled diabetes and a behavior disorder. He referred Robert to Roger Lyons (R. 217-18).

Also in March, 2006, Robert's vision was re-tested. The visual acuity in his right eye tested at 20/50, while the visual acuity in his left eye tested at 20/20. He had moderate amblyopia in the right eye (R. 235-36).

In April, 2006, Dr. Gospodinoff prescribed Concerta for Robert's symptoms of ADHD (R. 116).

In May, 2006, Mr. Morris evaluated Robert's condition and assessed controlled diabetes and a behavior disorder. Robert was started on immunizations for a return to public school. Also in May, 2006, Dr. Elsamahi prescribed Abilify for Robert's symptoms of ADHD (R. 117, 237).

In June, 2006, Mr. Morris evaluated Robert's condition and assessed controlled diabetes (R. 209-211).

In August, 2006, Robert became a patient of Dr. Hind Al-Sharif. Dr. Al-Shariff prescribed one dose of insulin in the morning, a second dose given on a sliding scale at noon, and a third dose in the evening (R. 241).

In September, 2006, Mr. Morris evaluated Robert's condition and assessed controlled diabetes (R. 202-04). Robert's vision was tested agin.

On November 20, 2006, Dr. Al-Shariff, evaluated Robert's condition. He determined that Robert's diabetes was not well controlled, adjusted Robert's medication, and referred him to a dietary services program. He also wrote that Robert had a history of ADHD and was taking Abilify (R. 237-240, 242).

Robert's mother submitted written statements. She reported that Robert had some difficulty with his vision. He could not see well at night and could not see items clearly at a distance of 15 feet. He was able to play video games and had a limited ability to walk, run, dance, swim, ride a bicycle, throw a ball, and jump rope, but she limited his physical activity in order to avoid a risk of diabetic shock or coma. He was not able to play sports. Robert kept an insulin emergency kit handy at all times, as well as water, juice, and candy

Robert and his mother testified at a hearing on January 10, 2007. Robert testified that he was 15 years old. He was not positive, but thought he was in the eighth grade. He understood the questions and was able to articulate responses but often struggled to recall helpful information.

Robert described problems with listening, paying attention, recalling events, staying focused, sticking with an activity, sleeping, and doing chores. He said he was part of a library club, where he was learning about the Japanese language with other adolescents. He felt he had friends. He explained that he usually had problems with other teenagers but got along with younger children. He admitted that he got into trouble at home and did things to annoy his mother. He could follow her "big" rules but not the "little" ones.

Robert's mother testified that Robert did not have friends. He was very bright and did quite well in certain subjects (math, science, and geography) but did poorly in other subjects (English, writing, and spelling). He could not stick with one task or subject and finish it. He was forgetful. He did not complete his chores. He was not always truthful, and she could not rely on him to monitor his blood sugar levels. He dressed himself but did not choose clothes that were appropriate for the season. She supervised Robert's blood sugar levels, which needed to be checked frequently. She gave him approximately 8-10 insulin shots per day, depending on his diet and blood sugar levels. She explained that Robert did not return to public school because he could not do a good job monitoring his own blood sugar levels and giving himself insulin shots.

The ALJ found that Robert had not engaged in substantial gainful activity and that he suffered from severe impairments. The ALJ also decided that Robert was not disabled because his impairments did not meet a listing or result in "marked" limitations in two domains of functioning or an "extreme" limitation in one domain of functioning (R. 12-24).

II.     **Standard of Review**

The ALJ's determination, if supported by substantial evidence, is conclusive. This Court may not reweigh evidence or substitute its judgment about the quality of the evidence for that of the ALJ. Rather, the Court reviews the record to ensure that correct legal standards were applied and that substantial evidence supports the conclusions drawn from the evidence. In particular, the Court reviews the record for "such relevant evidence as a reasonable mind might accept as adequate." *Richardson v. Perales*, 402 U.S. 389, 401 (S.Ct. 1971). Harmless errors do not permit a reviewing court to upset the agency's decision. *Sanchez v. Barnhart*, 467 F.3d 1081, 1082-83 (7th Cir. 2006).

### III. ALJ's Assessment of Medical Opinion Evidence

Plaintiff challenges that ALJ's assessment of medical opinion evidence, claiming that the ALJ improperly gave controlling weight to the opinions reached by a physician's assistant and ignored opinions offered by physicians.

A medical opinion is a statement from an acceptable medical source that reflect a judgment about the nature and severity of medical impairments. Medical opinions include statements about symptoms, diagnosis, prognosis, what the patient can still do, and what physical and mental restrictions the patient has. 20 C.F.R. § 416.927. ALJs must give controlling weight to a treating source's opinion on the nature and severity of an impairment when the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence." *Id*; Social Security Ruling 96-2p.

Plaintiff directs the Court's attention to the opinions offered by Dr. Al-Sharif. Dr. Al-Sharif evaluated Robert's condition on two occasions. Dr. Al-Sharif formed the impression that Robert had a history of ADHD and made adjustments in Robert's treatment after concluding that his diabetes was "uncontrolled" or "not well controlled" (R. 237, 239, 242). While these comments

qualify as medical opinions regarding Robert's condition, they do not describe Robert's ability to function or show that he had a marked limitation in one of the relevant domains. Furthermore, Dr. Al-Sharif's opinions appear to be date-specific. He did not suggest that Robert's blood glucose levels remained in an "uncontrolled" state for a continuous period of twelve months. Because Dr. Al-Sharif's opinions do not detract from the ALJ's findings and conclusions, any error in the ALJ's assessment of Dr. Al-Sharif's opinions is harmless.

Plaintiff also maintains that the ALJ gave controlling weight to opinions expressed by Mr. Morris, a physician's assistant. Because a physician's assistant is not an acceptable medical source, Mr. Morris' opinions could not be used to establish Robert's medically determinable impairments. 20 C.F.R. § 416.913(a). However, ALJs are entitled to consult a variety of sources when they evaluate functional abilities and limitations. 20 C.F.R. § 416.924a.

Mr. Morris monitored plaintiff's diabetes care over a period of time and provided some insight regarding Robert's ability to function. For example, Mr. Morris' formed the impression that Robert seemed to be very intelligent, appeared very healthy, and seemed to be able to focus on tasks. Mr. Morris also noted that Robert interrupted conversation, blurted answers before questions were completed, and fidgeted (R. 168-170). The ALJ did not err in considering Mr. Morris' observations of behavior which shed light on Robert's functional abilities and limitations.

Plaintiff further argues that the ALJ substituted his opinion for medical opinions voiced by Dr. Al-Sharif and a state agency physician.

ALJs may not substitute themselves for doctors by making medical determinations. *Scivally v. Sullivan*, 966 F.2d 1070, 1077 (7th Cir.1992). As noted above, Dr. Al-Sharif made a medical assessment when he determined that Robert's diabetes was uncontrolled in November, 2006.

Plaintiff believes the ALJ made a different medical assessment and decided that Robert's diabetes was well controlled (Doc. No. 18, p. 4). The Court has carefully reviewed the ALJ's report and is unable to locate any such medical assessment.

Plaintiff also points to the ALJ's assessment of Robert's ability to interact with and relate to others. In December, 2004, Dr. Rock Oh assessed Robert's level of functioning in this domain, finding that Robert's ability to interact with and relate to others was "less than marked" in severity (R. 127). The ALJ subsequently decided that Robert had no limitations in that domain (R. 20-21). Plaintiff believes the disparity shows that the ALJ made an independent medical assessment.

The ALJ's discussion of the evidence supporting this finding shows that the assessment was based on evidence added to the record after Dr. Rock Oh formed his opinion. In particular, the ALJ gave credit to Robert's hearing testimony describing friendships and peer group activity. Because the ALJ relied on evidence in the record, the Court is not inclined to view this aspect of the analysis as an independent medical assessment. Moreover, because Dr. Rock Oh never suggested that Robert's limitations in this domain were "marked" or "extreme," any improper medical determination was harmless.

**IV.     ALJ's Assessment of Robert's Functional Limitations**

Plaintiff raises additional concerns regarding the manner in which the ALJ evaluated Robert's ability to function in the relevant domains. First, she notes that the ALJ did not base his findings on medical evidence or articulate his assessment of certain medical evidence. The ALJ's discussion shows that the medical evidence was considered along with other relevant portions of the record. The ALJ summarized the medical evidence, reported that he considered medical opinions, and made specific reference to findings and observations reported by various sources, including St.

Louis Children's Hospital, Dr. Deppe, Dr. Coe, and Dr. Young (R. 18-24). The ALJ's analysis complies with the applicable legal standard. 20 C.F.R. §§ 416.924; 416.924a

Plaintiff also claims that the ALJ failed to consider and discuss all of the important evidence. ALJs are required to consider all relevant evidence. While each piece of evidence need not be addressed, the ALJ must articulate his analysis at a minimal level that permits review of the reasons for the decision. *Johansen v. Barnhart*, 314 F.3d 283, 287 (7th Cir. 2002). In support of this argument, plaintiff points to several portions of the administrative record, discussed below.

(1). Page 254. This is a treatment record prepared by Mr. Morris on February 13, 2004, shortly before Robert was admitted to St. Louis Children's Hospital. Because Mr. Morris is not an acceptable medical source, the ALJ rationally focused on evidence presented by Dr. Hollander during the same time period.

(2). Page 253. This is a treatment record prepared on January 12, 2005. It reflects Robert's condition at that time, as well as Mr. Morris's assessment that Robert's diabetes was poorly controlled. The ALJ did not discuss Mr. Morris' opinion. Instead, he referred to Robert's fasting glucose level (R. 15). Because Mr. Morris is not an acceptable medical source, the ALJ rationally focused on the objective evidence described in the report.

(3). Pages 237 and 240. Page 240 is a laboratory report from November 17, 2006, showing that Robert had a blood glucose level of 244. Page 237 is a pediatric record prepared by Dr. Al-Shariff three days later, reflecting his opinion that Robert's diabetes was not well-controlled. The ALJ did not specifically address these reports; however, when the ALJ explained his finding that Robert's diabetes was a severe impairment, he referred to medical evidence that Robert had "some high blood sugars" (R. 16). This comment shows that the ALJ considered the relevant information. Moreover, it permits the Court to follow the ALJ's reasoning: that evidence of some

high blood glucose levels during the relevant period supported the finding that Robert's diabetes is a severe impairment.

(4) Pages 119-130. These pages reflect the state agency reviews. Travis Terry, M.A. Warton, and Dr. B. Rock Oh reviewed Robert's records and determined that he did not have "marked" limitations in any domain. The ALJ considered this evidence but did not discuss it (R. 16). Because these records did not detract from the ALJ's findings or suggest that Robert's condition was functionally equal to the listings, the ALJ was not required to specifically articulate his assessment of the evidence.

(5). Pages 131-149. This portion of the record reveals that Robert's ADHD was diagnosed and treated with medication and behavior therapy several years before his mother filed for supplemental security income on his behalf. Although the ALJ recognized the ADHD diagnosis, he did not specifically mention this evidence. The Court is not persuaded that this was important evidence that should have been discussed. These records provide little insight regarding Robert's functional limitations during the relevant time period. Also, supplemental security income cannot be paid for the time before the application was filed. 20 C.F.R. § 416.335.

(6). Pages 184-186. This is the report presented by Dr. Deppe following a consultative psychological examination in August, 2004. The ALJ considered this report but did not mention aspects describing Robert's limitations (R. 15-21). For example, the ALJ did not explain how he evaluated Dr. Deppe's findings that Robert's ability to relate to others was "fair to poor;" that Robert's ability to understand and follow simple instructions was "fair;" that Robert's ability to maintain the level of attention required to perform simple, repetitive tasks was "fair to poor;" and that Robert's ability to withstand stress and pressure of day-to-day work activity was "fair." Furthermore, the ALJ did not explain the assessment of Dr. Deppe's 50-6 rating at Axis V, which

reflects his assessment of Robert's overall ability to function.

Defendant takes the position that Dr. Deppe's opinions do not show that Robert had marked or extreme limitations. It is suggested that the ALJ rationally relied on Robert's own description of his ability to interact and relate to others.

Defendant's position lacks merit. The ALJ did not articulate his analysis of Dr. Deppe's opinions in a manner that permits the Court to follow his reasoning. *See Murphy v. Astrue*, 496 F.3d 630, 635 (7th Cir. 2007). A reasonable ALJ could interpret Dr. Deppe's professional opinion as support for a finding that Robert had "marked" restrictions in two domains of functioning. Other evidence describing Robert's functioning levels might not be seen as accurate, considering his particular circumstances. *See* 20 C.F.R. § 416.924a(b)(5),(6). The ALJ did not explain why Dr. Deppe's professional assessment was inadequate or overcome by other evidence.

V.     **Substantial Evidence - Domain of Health**

Plaintiff also argues that the ALJ's particular findings are not supported by substantial evidence. With respect to the domain of health, she maintains that the record could only support a finding that Robert's diabetes was not well-controlled. The ALJ found that Robert had no limitation in health and physical well-being.

While the record shows that Robert has not always been able to regulate his blood glucose levels, there is a conflict in evidence describing the effect on Robert's ability to function as a normal adolescent (R. 67-68, 81-82, 88, 94-95, 122, 128). The ALJ's discussion does not explain how this conflict was resolved.[3] At this time, the Court is not in a position to determine whether the ALJ's

---

[3] While the ALJ discredited portions of the record describing the functional limitations of Robert's ADHD, the ALJ did not discredit evidence linking Robert's diabetes to significant physical and mental limitations (R. 18).

assessment of this functional domain is supported by substantial evidence.

## VI.     Substantial Evidence - Domain of Attending and Completing Tasks

Plaintiff argues that the ALJ's assessment of Robert's ability to function in this domain is not supported by substantial evidence. She points to testimony showing that Robert's difficulties continued despite treatment with medication (R. 262-292).

The ALJ decided that Robert's limitations in this domain were less than marked (R. 20). The discussion shows that the evidence plaintiff relies on was discredited (R. 18). Absent a reason to set aside the ALJ's credibility assessment, this argument lacks merit.

## VII.    Substantial Evidence - Domain of Interacting with and Relating to Others

Plaintiff argues that Robert's testimony regarding his friendships and club activity does not provide substantial support the ALJ's assessment. The ALJ decided that Robert had no limitation in interacting with and relating to others (R. 21). Because the ALJ failed to explain his assessment of Dr. Deppe's opinions, the Court is not in a position to evaluate the support for this assessment.

## VIII. Conclusion

Plaintiff's motion for summary judgment (Doc. No. 19) is GRANTED in part and DENIED in part, as follows. The Commissioner's final decision denying Sheila Grady's March, 2004, application for supplemental security income on behalf of Robert L. Darby is REVERSED. This case is REMANDED for further proceedings. On remand, the ALJ shall articulate the assessment of Dr. Deppe's findings and opinions and re-evaluate Robert's level of functioning in accordance with 20 C.F.R. §§ 416.924a(b)(5), 416.924a(b)(6). Also, the Commissioner shall re-evaluate Robert's functional limitations in the specific domains of general health and interacting with and relating to others in accordance with 20 C.F.R. §§ 416.926a(i), 416.926a(l). Judgment shall enter

pursuant to the fourth paragraph of 42 U.S.C. § 504(g).

      **SO ORDERED:**   **June 10, 2008**  .

                                     *s/Philip M. Frazier*
                                     **PHILIP M. FRAZIER**
                                     **UNITED STATES MAGISTRATE JUDGE**